NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1117

INTERSHELL INTERNATIONAL CORP.

vs.

GREAT EASTERN MARINE SERVICE, INC.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This action concerns a contract for the defendant, Great Eastern Marine Service, Inc. (GEM), to construct a pier for the plaintiff, Intershell International Corp. (Intershell). The parties dispute whether the agreement included a condition precedent that GEM would obtain a building permit such that construction would be complete before June 1, 2020. GEM did not obtain a building permit in time to do so (through no fault of either party), and Intershell then brought this action in which both parties alleged, among other claims and counterclaims, that the other breached their agreement. After a bench trial, a judge of the Superior Court concluded that the agreement did contain an unfulfilled condition precedent and, as a result, the

contract was unenforceable.  The judge ordered GEM to return the
$100,000 that Intershell previously had paid GEM, less $5,000
that GEM expended in preparation to complete the work.

The parties cross-appealed from the judgment.  GEM argues
that the judge's findings that the contract contained a
condition precedent and that Intershell's $100,000 payment
constituted a refundable deposit were clear error.  Intershell
counters that it was entitled to prejudgment interest on the
amount it received under the judgment.  We vacate so much of the
judgment as declined to award prejudgment interest and remand
for reconsideration.[1]  We otherwise affirm.

Background.  We set forth the undisputed facts as well as
those found by the judge after trial.  We reserve certain facts
for our later discussion.

Intershell is a commercial fishing business and GEM is a
marine construction business.  Howard Monte Rome is Intershell's
general manager.  Kenneth Taliadoros (Kenneth) is GEM's owner
and president, and Kenneth's son, Jonathan Taliadoros
(Jonathan), is an engineer for GEM.[2]

---

[1] Although the judgment itself does not include the order to
return the deposit, we treat that order as subsumed in the final
judgment that entered on April 6, 2023.

[2] Because Kenneth and Jonathan share a last name, we refer
to them by their first names.

1. The bid and the contract. In December 2019, Intershell sought bids to construct a new pier (project) on its property in the city of Gloucester (city).[3] Intershell wanted the project completed by June 1, 2020,[4] which was the start of its busy season. To that end, Rome and Kenneth, who were acquainted because of the parties' previous business dealings over the years, met at the property to discuss the project. At that meeting, Rome gave Kenneth copies of certain documents including an amended order of conditions (OOC) that Intershell had obtained for the project from the city's conservation commission.

On January 10, GEM sent a written bid for the project in the amount of $357,500 to Intershell. The bid provided that "[u]nless specifically modified in the attached quotation/proposal, payment terms require [one-third] upon acceptance, [one-third] upon [fifty percent] completion and [one-third] upon [one hundred percent] completion." In the e-mail message accompanying the bid, Kenneth stated that the "quote includes [GEM] pulling the building permit for the project." Notwithstanding that representation, the bid specified that "[a]ll permits are by owner."

---

[3] My Management Group, LLC, an Intershell affiliate, is the record owner of the property.

[4] Unless otherwise specified, all events took place in 2020.

3

On January 25, Rome, Kenneth, and Jonathan met to discuss GEM's bid. During that meeting, the parties agreed to the terms set forth in GEM's bid with the following three oral modifications: (1) Intershell's first payment to GEM would be in the amount of $100,000 rather than one-third of the bid price ($117,975); (2) GEM was responsible for obtaining the building permit for the project; and (3) the project had to be completed, and GEM's equipment and barge removed from the site by June 1. The parties signed the bid and Intershell provided GEM with $100,000. Of the three bids that Intershell received for the project, GEM's bid was the highest. However, Intershell selected GEM's bid because GEM was the only bidder prepared to complete the project by June 1.

2. Building permit and GEM's preparation work. On February 19, Kenneth submitted the building permit application to the city. Kenneth believed that the city would quickly issue the building permit because Intershell already obtained several environmental-related permits, including the OOC. On February 22, GEM brought a barge and other equipment to the job site. At that time, Kenneth informed Rome that he had not yet received the building permit. A few days later, Jonathan and another GEM employee performed some preparation work on the job site, including removing debris and preparing to demolish and remove a

4

concrete slab. GEM spent between $5,000 and $6,000 to complete this work.

On February 27, Kenneth contacted the city's building department to inquire about the status of the permit application and learned that the conservation commission was "holding up" approval of the application. Kenneth then contacted the conservation commission and was told that the permit application had to be denied because the OOC previously obtained by Intershell was not valid. Kenneth immediately told Rome and, in turn, Rome took prompt action to obtain a new OOC.

Rome kept Kenneth apprised of the status of the OOC, but its issuance was delayed by the conservation commission. When it became clear that the new OOC would not issue in time for GEM to obtain a building permit and complete the project by June 1, Intershell took the position that the contract was null and void and offered to cover GEM's costs thus far. GEM continued to offer to complete the project once the permit issued.

In April, Rome directed Kenneth to remove its barge and equipment, and GEM did so. In May, Rome requested that Kenneth return Intershell's $100,000 and stated that the parties could discuss GEM performing the work in the coming fall or winter. GEM continued to offer to perform under the agreement once the permit was obtained. That same month, Rome suggested that GEM provide a new bid consistent with the lower bid prices that it

5

previously received (between $220,000 and $265,000) because the parties' agreement was "no longer valid" and Intershell was not willing to pay "the premium" price for the project given that the June 1 deadline could not be met. In June, Rome notified Kenneth that Intershell received the OOC and was ready "to make a plan for the work." Kenneth responded that the parties' attorneys should have further discussions. Intershell later awarded the project to another company for $219,000.

3. The judge's findings. In August, Intershell brought an action for breach of contract and violation of G. L. c. 93A.[5] GEM brought counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of G. L. c. 93A. The matter proceeded to a jury-waived trial where Rome, Kenneth, and Jonathan testified. After hearing the parties' evidence, the judge allowed each party's motion for involuntary dismissal of the other's c. 93A claim.

Following the trial, the judge entered written findings on the parties' breach of contract claims and GEM's breach of the covenant of good faith and fair dealing claim, the relevant portions of which are summarized as follows. The judge found that the parties entered into a valid contact that required GEM

_____

[5] Intershell also brought a fraud claim that was dismissed prior to trial. The parties make no argument about that claim on appeal.

6

to complete the project, and to remove its equipment and barge by June 1. The requirement that GEM obtain a building permit to complete the work by June 1 was a condition precedent to the parties' performance under the contract. Because that condition could not be met through no fault of the parties, the contract was unenforceable and neither party was in breach. Intershell also did not breach the implied covenant of good faith and fair dealing because Intershell acted in good faith and made expeditious attempts to obtain a new OOC.

As to the $100,000 that Intershell paid to GEM, the judge found that payment was a deposit that must be returned. Nonetheless, the judge found that GEM was entitled to be paid for the services it rendered under the doctrine of quantum meruit and that the fair and reasonable value of the work performed by GEM in preparation for the project was $5,000. In light of these findings, the judge ordered that GEM return $95,000 of the deposit to Intershell. The judge further ordered that "[n]o party is entitled to recover interest (because no monetary judgment shall enter) or their costs." Judgment then entered and this cross appeal followed.

Discussion. "We review a judge's findings of fact under the clearly erroneous standard and his conclusions of law de novo." Casavant v. Norwegian Cruise Line Ltd., 460 Mass. 500, 503 (2011).

7

1.  Condition precedent.  GEM first argues that the judge's finding that the contract included a condition precedent was clear error.  "A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract."  Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45 (1991) (Massachusetts Mun.).  A condition precedent may be expressly created by the parties, usually through the use of "[e]mphatic words" in the contract (citation omitted).  Id. at 46.  A condition precedent also may be implied in fact if "the intent of the parties to create one is clearly manifested in the contract as a whole."  Id.  See Restatement (Second) of Contracts § 226 comments a and c (1981); 8 T. Murray, Corbin on Contracts § 30.10 (rev. ed. 2018).

"Where, as here, the terms of an oral agreement are in dispute, the finder of fact determines the terms of any agreement 'from the conversation of the parties and their conduct'" (citation omitted).  Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 420 (2005).  "Where the dispute concerns a condition precedent, 'a court looks to the parties' intent to determine whether they have created a condition precedent.  To ascertain intent, a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances'" (citation omitted).  Id.

8

Here, the judge made explicit findings that at the time they entered into the agreement, the parties clearly understood and agreed to the following. First, that the work on the project could not be performed until GEM secured the building permit from the city. Second, that the project must be completed, and GEM's barge and equipment must be removed from the job site by June 1, as this deadline was an essential and material term of the parties' agreement. Although those terms were not reduced to writing, the judge's finding that the parties orally agreed to these terms was adequately supported by Rome's testimony at trial and the parties' written communications in evidence.[6]

The judge properly considered this evidence when determining that the parties intended the contract to contain a condition precedent. This was not clear error. See Tilo Roofing Co. v. Pellerin, 331 Mass. 743, 746 (1954) (parties orally agreed to condition precedent that written agreement not effective until defendants satisfied as to quality of plaintiff's work). See also Twin Fires Inv., LLC, 445 Mass. at

---

[6] The judge did not credit Kenneth's testimony that the June 1 deadline was not firm and that GEM could complete the work in the fall. On that point, the judge instead credited Rome's testimony and other evidence to the contrary, and we defer to the judge's findings on that point. See Twin Fires Inv., LLC, 445 Mass. at 421 (judge's findings resolving disputes over content of oral conversations entitled to deference).

421 (where parties' intent must be deduced from conflicting testimony, "we accord particular deference to the judge's findings"). Moreover, where that condition precedent was unfulfilled through no fault of the parties, the judge correctly concluded that the contract was unenforceable and thus neither party was in breach.[7] See Massachusetts Mun., 411 Mass. at 45.

2. Order to return deposit. a. Deposit. GEM next argues that it was entitled to keep the $100,000 paid by Intershell at the January 25 meeting because it was a nonrefundable installment payment and not a deposit. In support, GEM points to written bid that sets forth "payment terms," which required the first of the three payments to be made on acceptance of the bid.

As an initial matter, we note that the bid discusses "payment terms" but not deposits or installments. Regardless, the judge found that the parties orally agreed to modify the payment terms at the January 25 meeting by reducing the amount due on acceptance. More importantly, the judge made a specific

---

[7] For the same reasons, GEM's claim that Intershell breached the covenant of good faith and fair dealing fails, see Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (implied covenant of good faith and fair dealing does not "create rights and duties not otherwise provided for in the existing contractual relationship"), as does its related claim for a violation of G. L. c. 93A.

10

finding that the parties intended for the payment made at the January 25 meeting to be treated as a deposit.

Conflicting evidence was presented on the nature of the payment, but there was ample evidence to support the judge's finding of a deposit.  For example, ten days before the January 25 meeting, Rome informed Kenneth via text message, "I will go ahead with your offer and will be ready with a deposit early next week."  Kenneth did not contest Rome's characterization of the deposit and simply responded, "Great I'll plan on seeing you next week."  Moreover, Rome testified that the parties negotiated "a requirement of [a] deposit for $100,000."  The nature of the payment turned on the parties' intent and we defer to the judge's finding on this point.  See Twin Fires Inv., LLC, 445 Mass. at 421.  See also Rood v. Newberg, 48 Mass. App. Ct. 185, 191 (1999) ("If the trial judge makes one of several possible choices of what facts are supported by the evidence, the judge's choice is not clearly erroneous" [citation omitted]).

b.  Cost of GEM's preparation work.  GEM next argues that the judge committed clear error by disregarding its evidence of the costs for its preparation work.  However, the judge's finding that "the value of the labor and materials to GEM for bringing the barge and equipment to the job site, and for performing the preparation work was approximately $5,000 to

11

$6,000," was amply supported by Jonathan's own testimony. Jonathan testified as to the work that GEM completed between February and April. When asked if he had "any estimate as to the costs incurred for that period of time," Jonathan responded, "I think in the tune of, direct out-of-pocket cost, for those specific items, was probably 5 or $6,000."

Although GEM also sought to recover additional costs from Intershell (including $50,000 for the two-month period that equipment owned by GEM was at the project site and $20,000 for business overhead), the evidence on these costs consisted only of brief testimony from Jonathan and a single-page spreadsheet that Jonathan created in preparation for GEM's bid on the project. The judge did not commit clear error in rejecting that minimal evidence of GEM's additional costs and instead determining that $5,000 constituted a fair and reasonable value for the services rendered.

c. Prejudgment interest. Intershell's sole argument on cross appeal is that it was entitled to prejudgment interest under G. L. c. 231, §§ 6C and 6H. GEM counters that no such interest is permitted because the judge's order to return the deposit did not constitute a damages award.

In relevant part, G. L. c. 231, § 6C, provides as follows:

"In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court

12

to the amount of damages, at the contract rate, if
established, or at the rate of twelve per cent per annum
from the date of the breach or demand."

The statute also applies to quantum meruit damages.  See Peabody

N.E., Inc. v. Marshfield, 426 Mass. 436, 444-446 (1998).  "[T]he

policy underlying G. L. c. 231, § 6C, is that '[p]rejudgment

interest serves to compensate [a party] for the loss of use of

money wrongfully withheld'" (citation omitted).  Henry v.

Morris, 62 Mass. App. Ct. 714, 717-718 (2004).[8]

We turn then to whether the statute applies to the judge's

order for the return of Intershell's deposit.  The circumstances

here are analogous to those in National Starch & Chem. Co. v.

Greenberg, 61 Mass. App. Ct. 906, 906 (2004) (National Starch),

which pertained to an agreement for the sale of commercial

property.  The agreement allowed the seller to retain the

buyer's deposit as liquidated damages if the buyer breached the

agreement.  See id.  The agreement also included a mortgage

contingency clause that provided that the agreement was "void

without recourse to the parties" and the buyer was entitled to

return of her deposit if the buyer provided timely written

notice that she was unable to obtain financing.  Id.  The

---

[8] "General Laws c. 231, § 6H, is a 'catch-all interest
provision,' that 'reflects the Legislature's intent that
prejudgment interest always be added to an award of compensatory
damages'" (citations omitted).  Governo Law Firm LLC v.
Bergeron, 487 Mass. 188, 198-199 (2021).

13

parties disputed whether they agreed to extend the deadline to comply with mortgage contingency clause, but ultimately the buyer did not obtain financing. See id. at 906-907. Both parties requested the deposit from the escrow agent and the agent refused to release the funds to either party. See id at 907. The seller then brought an action to recover the deposit on grounds that the buyer was in breach. See id. The court concluded to the contrary, finding that the agreement was "void without recourse" because the buyer timely exercised her right under the mortgage contingency clause. Id. The court ordered the deposit to be returned to the buyer and awarded prejudgment interest under G. L. c. 231, §§ 6C and 6H. National Starch, supra. As to the interest, the court held that the buyer was entitled to prejudgment interest because the seller demanded the deposit from the escrow agent at the point in time when the agreement was void and that demand "did deprive the buyer of funds to which she was then rightfully entitled." Id. Cf. Henry, 62 Mass. App. Ct. at 718 (prejudgment interest not required under National Starch where buyer-plaintiffs did not seek return of deposit, only specific performance, and judge made no finding that deposit was wrongfully withheld).

Here, after it became clear that the permit would not issue in time for the work to be completed by the June 1 deadline, Intershell requested that GEM return its deposit less GEM's

14

expenses for the preparation work.  GEM refused to do so and took the position that it was "not contractually obligated to refund any portion of the first payment due to delays in the permit process."  Ultimately, Intershell initiated this action to recover the $100,000 deposit.  Although the judge did not explicitly find that the deposit was "wrongfully withheld," the facts as found suggest that threshold was met for the same reasons as in National Starch.

We recognize that G. L. c. 231, § 6C, sets forth different events that trigger the accrual of prejudgment interest -- i.e., the date of breach (of which there was none here), demand, or commencement of the action.  When prejudgment interest begins to accrue is a question for the fact finder.[9]  See Aronovitz v. Fafard, 78 Mass. App. Ct. 1, 10 (2010).  Accordingly, we remand the case for further consideration on the issue of prejudgment interest.

Conclusion.  We vacate so much of the judgment entered April 6, 2023, as declined to award prejudgment interest.  In all other respects, the judgment is affirmed.  The case is

---

[9] GEM argues that a trial judge may adjust an award of prejudgment interest if it would "result in a windfall for plaintiffs amounting, in essence, to an award of punitive damages."  Sterilite Corp. v. Continental Cas. Co., 397 Mass. 837, 841 (1986).  See Nissan Autos. of Marlborough, Inc. v. Glick, 62 Mass. App. Ct. 302, 311 (2004).  However, the judge made no such finding here.

remanded for reconsideration of prejudgment interest and entry of an amended judgment consistent with this memorandum and order.

          <u>So ordered</u>.

          By the Court (Meade,
           Englander & Hodgens, JJ.[10]),

          Clerk

Entered:  October 4, 2024.

---

[10] The panelists are listed in order of seniority.